UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

TANGI JACKSON-NIBBS,                    )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        Case No. 1:19-cv-03729-TWP-MPB
                                        )
UNITED WAY OF CENTRAL INDIANA,          )
                                        )
                Defendant.              )

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY

This matter is before the Court on a Motion for Summary Judgment filed pursuant to

Federal Rule of Civil Procedure 56 by Defendant United Way of Central Indiana ("United Way")

(Filing No. 49). After her employment with United Way ended, Plaintiff Tangi Jackson-Nibbs

("Jackson-Nibbs") filed this action alleging race discrimination and retaliation against United Way

pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the Civil Rights Act of 1871,

42 U.S.C. § 1981 ("Section 1981") (Filing No. 1). United Way filed a Motion for Summary

Judgment on all of the claims, and following briefing, Jackson-Nibbs filed a Motion for Leave to

File Surreply (Filing No. 65). For the following reasons, the Court **grants** United Way's Motion

for Summary Judgment and **denies** Jackson-Nibbs' Motion for Leave to File Surreply.

## I.        BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of

Civil Procedure 56, the facts are presented in the light most favorable to Jackson-Nibbs as the non-

moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 255 (1986).

United Way is a nonprofit organization established in 1918 which strives to help Central Indiana residents achieve and maintain self-sufficiency by focusing on four key areas of community impact: education, financial stability, health, and basic needs.  It serves residents in Boone, Hamilton, Hancock, Hendricks, Marion, and Morgan counties. United Way has partnered with more than eighty local agencies and organizations to help improve the quality of life for Central Indiana residents (Filing No. 50-7 at 3–4).

On September 8, 2014, Jackson-Nibbs, who is African-American, began working at United Way as an Energy Assistance Program ("EAP") Coordinator.  EAP is a federally-funded grant program that provides financial assistance to low-income households to maintain utility services such as electricity and gas.  Jackson-Nibbs' position was funded through the grant. As an EAP coordinator, she processed applications, conducted intake of applications, and met with clients to help them pay their utility bills.  When she applied for the job, Jackson-Nibbs stated that she was willing to work overtime, including Saturdays.  Throughout her employment, she reported to Mary Jones ("Jones"), the Director of EAP.   Jones interviewed Jackson-Nibbs and made the recommendation to Rick Tisdale ("Tisdale"), the Director of Human Resources, to hire her (Filing No. 50-1 at 8, 11–15, 21–22, 25–26, 196; Filing No. 50-3 at 7–9).

The busy season for EAP was October through March, driven by colder temperatures and more applications for utilities assistance (Filing No. 50-3 at 21–22; Filing No. 50-4 at 22).  EAP hired temporary employees to assist with processing applications during the busy season from approximately October to March.  Because these were temporary employees, they did not receive performance reviews and were not held to the same performance standards as fulltime United Way employees.  There was one other fulltime associate on the EAP team—Cherelle Prim ("Prim") who is African-American (Filing No. 50-7 at 2).

Approximately four months after beginning her work at United Way, Jackson-Nibbs met with Jones on January 29, 2015, to discuss Jackson-Nibbs' mid-year performance evaluation and performance goals. Thereafter, Jones preformed an annual performance review of Jackson-Nibbs for the 2014–2015 year. Jones provided Jackson-Nibbs with individual scores on individual items in this performance review, rather than an overall score, and she received scores of 3 or 4 out of 5. Jackson-Nibbs met her goals in the 2014–2015 review (Filing No. 58-18 at 10, 12; Filing No. 58-2; Filing No. 58-20 at 21–23).  However, in order to achieve these goals, Jackson-Nibbs often worked seven days a week, putting in an extreme number of hours (Filing No. 58-19 at 12).

In less than a year from her start date, Jones made the decision to promote Jackson-Nibbs to the associate position in EAP, effective August 10, 2015.  It was a salaried, exempt position. The promotion was due to United Way's review of the position and a determination that "associate" was a better description for the duties performed by Jackson-Nibbs.  As an associate, Jackson-Nibbs' duties included planning, scheduling, coordinating, and training all intake specialists, case managers, and quality assurance specialists for EAP.  It was also her responsibility to assign the daily operations of intake and quality assurance team members to ensure tasks were completed in a timely and efficient manner; and to evaluate, monitor, and measure the performance of intake and quality assurance team members on EAP policies and procedures, including processing applications, reviewing applications, mail room, and front desk procedures (Filing No. 50-1 at 38–39, 44–46, 250–53; Filing No. 50-3 at 15–16; Filing No. 50-4 at 32; Filing No. 50-5 at 21).

Jones met with Jackson-Nibbs to deliver her 2015–2016 annual performance review.  In this performance review, Jackson-Nibbs was given an average score of 3.6 out of 5 for United Way's core competencies, and an average score of 3.2 out of 5 for performance competencies.  A score of "3" was considered "successfully meets expectations." After Jones delivered the annual

review, Jackson-Nibbs electronically added comments and signed-off on the review. In her comments, Jackson-Nibbs explained that she would like to discuss changing her title from associate to manager because she felt that better reflected the work she performed. Jackson-Nibbs did not discuss this with Jones during the annual performance review meeting, and Jones was not sent a notification about the additional comment being entered after the meeting. As a result, Jones was not aware of Jackson-Nibbs' comment at the time (Filing No. 50-1 at 53–54, 254–66; Filing No. 50-3 at 65–66; Filing No. 50-2 at 19).

Jones and Jackson-Nibbs worked together to set Jackson-Nibbs' goals and action items for the 2016–2017 performance year. At United Way, an employee's goals were set at the beginning of each performance year and were communicated to each employee by their leader. Where a position was covered by a grant, often the grant itself helped determine the goals. For 2016–2017, Jackson-Nibbs' goal of providing high quality EAP services included the action items of retraining intake specialists as needed based on weekly quality assurance review scorecards, updating or creating procedures to minimize errors, and training the entire Indianapolis EAP team. The goal was to audit at least 30% of applications and have an audited error rate below 7.6% (Filing No. 50-1 at 56–57, 267–68; Filing No. 50-4 at 48).

In her 2016–2017 mid-year performance evaluation, Jackson-Nibbs received a rating of "successfully meets expectations" for many goals, but she received a rating of "requires development" for the goal of providing high quality EAP services. She was informed that she had not created a process to minimize errors and to retrain the intake specialists, and intake specialists were not consistently being retrained in a timely manner to minimize the error rate. The retraining was not occurring during most of the season and was not occurring consistently throughout several months of the program. Team members, including Jackson-Nibbs herself, reported to Jones that

retraining was not happening. The mid-year performance evaluation also noted that Jackson-Nibbs needed to work on timely communicating up-to-date plans and information through email (Filing No. 50-1 at 61–63, 269–76; Filing No. 50-3 at 40, 47–49).  Jones believed this 2016–2017 mid-year performance evaluation occurred in January or early February 2017 while Jackson-Nibbs believed it may have occurred in April 2017 (Filing No. 58-20 at 27; Filing No. 58-18 at 18).

In 2017, Chief Talent Officer Nancy Ahlrichs ("Ahlrichs") conducted individual meetings with all United Way employees. Ahlrichs held an individual meeting with Jackson-Nibbs on March 10, 2017. During this meeting, Jackson-Nibbs told Ahlrichs that she would like to be a manager (Filing No. 50-1 at 65–66, 73, 277; Filing No. 50-4 at 6–7, 66–67, 74–75).  In response to Ahlrichs' question—"Is [United Way] a great place to work for all diverse employees?"—asked of every employee in the individual meetings, Jackson-Nibbs responded, "I believe white females and males have it better," and she saw "whites getting promotions especially in fundraising. It appears fundraising gets the kudos." (Filing No. 50-4 at 65, 75; Filing No. 50-1 at 72.) Jackson-Nibbs reported to Ahlrichs that she was less happy working at United Way than she was a year earlier.  She also reported to Ahlrichs that she was working seven days a week and 16-hour days. She explained that she was less happy in her job because of the incredible hours she was having to work to meet her goals, and her department was understaffed to complete the job (Filing No. 58-21 at 18; Filing No. 50-4 at 74–75).

Following the individual meeting with Jackson-Nibbs, Ahlrichs spoke with Tisdale and Jones about Jackson-Nibbs' desire to be a manager. As the Director of EAP, Jones was the individual who had the responsibility of managing EAP. Because EAP was funded by federal grants and already was staffed appropriately, there was no funding or need for an additional manager position in EAP. Ahlrichs explained this to Jackson-Nibbs and encouraged her to apply

5

for positions outside EAP that would put her on a manager track.  However, Jackson-Nibbs was not interested in a position outside EAP (Filing No. 50-4 at 8–11; Filing No. 50-5 at 22–23; Filing No. 50-3 at 36).

When Jackson-Nibbs received her 2016–2017 annual performance review, her summary score had decreased to only 2.9 out of 5 with an overall score on completion of her individual goals of only 2.7 out of 5.  She again received a rating of "requires development" for the goal of providing high quality EAP services. The performance review noted a high audit error rate, no plan for retraining team members, a continued lack of retraining for intake specialists, and a decline in verbal and written communications about plans for retraining (Filing No. 50-1 at 278–91). Retraining was something that should have been ongoing and occurring on a weekly basis as issues were identified, but it was not happening on an ongoing basis (Filing No. 50-3 at 51). Jackson-Nibbs acknowledged to Jones that the retraining was not happening. *Id.* at 75. Jackson-Nibbs was told that she must develop a plan for necessary retraining and failure to do so would result in being placed on a performance improvement plan (Filing No. 50-1 at 281). Concerning the goal of an audit error rate of 7.6%, the audit error rate actually achieved was 13.27%, and Jackson-Nibbs told Jones that this goal was unrealistic and to achieve it she would have to work eighty to ninety hours per week (Filing No. 58-19 at 10). Jackson-Nibbs and Jones also discussed Jackson-Nibbs' desire to have her title changed from associate to manager, and Jones indicated that she and Tisdale would review Jackson-Nibbs' role and responsibilities to determine whether the title of "manager" was appropriate (Filing No. 50-1 at 290). Jackson-Nibbs and Jones electronically signed the 2016–2017 annual performance review on August 25, 2017. *Id.* at 291.

Jones and Jackson-Nibbs again worked together to set Jackson-Nibbs' goals and action items for the 2017–2018 performance year.  The goal of providing high quality EAP services had

the highest weight of all the goals.  Jackson-Nibbs believed that Jones wanted to focus on that goal because Jones determined it was the most important of the goals. The action items for that goal specifically included developing written procedures on providing timely feedback to intake specialists when errors are identified by quality assurance specialists and developing, written procedures to minimize errors and establishing retraining guidelines for team members as needed, both by September 29, 2017. It also again included the goal of an audit error rate of 7.6%; and although Jackson-Nibbs told Jones that the goal was unrealistic, Jones left the goal in place (Filing No. 50-1 at 90–92, 296–98; Filing No. 58-18 at 26).

Because EAP typically is busiest October through March, EAP team members occasionally had to work on Saturdays to catch up on applications for utility assistance.  During the 2017–2018 busy season, Jackson-Nibbs did not work four of the required Saturdays (Filing No. 50-1 at 96–98, 104, 299–302). However, Jackson-Nibbs was not disciplined for missing these Saturdays (Filing No. 50-7 at 1). During this busy season, Jackson-Nibbs requested vacation time for December 27 and 28, 2017 (Filing No. 50-1 at 303).  In Jackson-Nibbs' first year with United Way, she was permitted to take vacation in December because she had a previously-scheduled vacation. However, Jackson-Nibbs was told at that time that she would not be given time off during the busy season in the future because no one in EAP was allowed to take vacation during the busy season absent extenuating circumstances or emergencies (Filing No. 50-4 at 7, 9–10; Filing No. 50-7 at 4). Jackson-Nibbs later testified that she was not told when she began working at United Way that she would not be able to take time off in December (Filing No. 58-19 at 11).

Jones discussed Jackson-Nibbs' December 27 and 28, 2017 vacation request with Tisdale. Based on EAP's workload and busy season, Tisdale told Jones that United Way could not grant Jackson-Nibbs' vacation request.  All EAP employees were told that no time off would be granted

absent extenuating circumstances, and no other EAP employees received vacation during that time period. Jones communicated to Jackson-Nibbs Tisdale's decision to deny the December 27 and 28, 2017 vacation request, and this was the only time she requested vacation that was denied (Filing No. 50-5 at 33–34; Filing No. 50-1 at 106, 303; Filing No. 50-4 at 20, 69; Filing No. 50-7 at 4).

Ahlrichs held her annual individual meeting with Jackson-Nibbs during the first week of January 2018. During their meeting, Jackson-Nibbs vented about her relationship with Jones and talked about feeling that she was being unfairly evaluated. She also talked about feeling like she was working in a hostile environment. She talked about the denial of her vacation time, which she felt was unreasonable because it was for her wedding anniversary, and she explained that she rarely took lunch breaks. Jackson-Nibbs also expressed that she was less happy than the year before because of unrealistic and unfair work expectations, and they were working with fewer people but required to do the same amount of work with a low error rate. Jackson-Nibbs again brought up her desire to have her title changed to manager. Ahlrichs again explained that Jackson-Nibbs was welcome to apply for positions outside EAP because there was not a manager position available in EAP. However, Jackson-Nibbs still was not interested in applying for positions outside EAP (Filing No. 50-1 at 110–13; Filing No. 50-4 at 18–19, 76–77).

Ahlrichs followed up with Tisdale and Jones after her meeting with Jackson-Nibbs. Jones and Tisdale again explained that there was no additional manager role available in EAP, there had not been in the past and there did not seem to be a need, and Jones functioned in that role over the entire program. Regarding the vacation time, Jones and Tisdale explained that no one was granted time off during peak season. Then Ahlrichs followed up with Jackson-Nibbs to reiterate that nothing had changed regarding a manager position or taking vacation days during the busy season (Filing No. 50-4 at 20, 23).

On February 12, 2018, Jones met with Jackson-Nibbs to provide her 2017–2018 mid-year performance evaluation.  Jones provided Jackson-Nibbs with specific feedback on how to improve her performance, especially with communication deficiencies.  Jones instructed Jackson-Nibbs to send her a weekly report of what she had done each week. During their meeting, Jones and Jackson-Nibbs started discussing other topics, and Jackson-Nibbs forgot that Jones had asked her to send these weekly emails. A couple weeks later, Jones sent her an email reminding her of this requirement, and once prompted, Jackson-Nibbs provided Jones weekly update emails from March 9 through June 1, 2018.  Jackson-Nibbs stopped sending her weekly update emails to Jones in June 2018 after the winter program ended (Filing No. 50-1 at 304–17; Filing No. 58-18 at 33; Filing No. 58-11; Filing No. 58-20 at 12).

On April 2, 2018, after receiving her mid-year performance evaluation, Jackson-Nibbs asked to meet with Jones' supervisor, Kiko Suarez ("Suarez").  Jackson-Nibbs prepared a document of discussion topics to provide to Suarez during their meeting.  They met on April 17, 2018, and Jackson-Nibbs complained that Jones' temperament created a hostile, uncomfortable environment. Jackson-Nibbs described Jones as a "dictator," a "drill sergeant," and "impatient."  She explained that Jones does not listen, interrupts, and makes others feel stupid.  Jackson-Nibbs further explained to Suarez that Jones made inappropriate and unprofessional comments about Jackson-Nibbs' prior employer. When Jackson-Nibbs told Jones she felt uncomfortable talking about her prior employer, Jones agreed to stop making those comments around her.  Jackson-Nibbs shared with Suarez her concern about Jones retaliating against her (Filing No. 50-1 at 124–30, 318–22).

In her meeting with Suarez, Jackson-Nibbs also identified two examples of employees whom she claimed Jones favored and two examples of employees whom she claimed Jones did not favor.  Each of the employees identified by Jackson-Nibbs was African-American or "mixed"

race.  Jackson-Nibbs complained to Suarez about the denial of her two days of vacation.  Jackson-Nibbs also stated she felt Jones gave her negative performance evaluations to avoid promoting her to manager.  She explained to Suarez that she felt the performance evaluations were unfair because they were largely based on EAP audit ratings, which took into account the work of other organizations over which she had no control.  Jackson-Nibbs provided a list to Suarez of everyone who had been promoted from the time that she was hired until their meeting (Filing No. 50-1 at 72, 130–32, 320–22; Filing No. 50-6 at 23–24).

At the end of the meeting, Suarez recommended using a DiSC profile—an assessment tool used to help alleviate conflict between work colleagues—to assist with the working relationship between Jackson-Nibbs and Jones.  He also discussed other possible opportunities that United Way might have for her and recommended looking for other options if EAP was not good for her.  Jackson-Nibbs told Suarez that she loved working in EAP and wanted to stay there. Suarez informed Jackson-Nibbs that he would follow up on her concerns, and Jackson-Nibbs was hopeful and felt better about things after she met with Suarez (Filing No. 50-6 at 7, 16–17; Filing No. 50-1 at 132–34, 323).

Immediately after Suarez's meeting with Jackson-Nibbs, Suarez went to Ahlrichs' office, and he was "fairly upset." Suarez explained to Ahlrichs that Jackson-Nibbs "had a stack of the announcements of white employees who had been promoted," and she did not specifically complain about race discrimination, but she was implying it (Filing No. 50-4 at 37–39). Suarez shared Jackson-Nibbs' concerns with Ahlrichs and also with Tisdale. Regarding Jackson-Nibbs' concern about white employees being promoted, Ahlrichs assured Suarez that United Way tracked its promotion data by gender, race, ethnicity, and age, and the promotion rate was consistent with and reflected United Way's employment population by race (Filing No. 50-6 at 9; Filing No. 50-5

at 23; Filing No. 50-4 at 39–41). Suarez shared with Jones that Jackson-Nibbs met with him about her desire to be a manager, but he did not share any other content of the meeting with Jones (Filing No. 50-3 at 58).

On April 25, 2018, a week after Jackson-Nibbs met with Suarez, Jackson-Nibbs met with Tisdale and Ahlrichs to discuss her concerns. During this meeting, Jackson-Nibbs did not raise any issues concerning race. Tisdale explained to Jackson-Nibbs that, while she was welcome to apply for any other position at United Way, there still was not a need for a manager in EAP because Jones already was filling that need as the director. Tisdale told her that there never would be an EAP manager's position, and Jackson-Nibbs responded that she understood. Tisdale also told Jackson-Nibbs the employees she identified as being promoted to manager had either applied for management opportunities outside of their division or in non-grant funded areas. Tisdale explained to Jackson-Nibbs that there were opportunities outside of a small grant-funded program, and he encouraged her to apply as well as asked her if she had applied for anything. She responded that she had not applied for any other positions and that she wanted to stay within EAP. Tisdale informed her that she was limiting herself to opportunities by wanting to stay in EAP (Filing No. 50-6 at 9; Filing No. 50-5 at 14–16, 24–25, 30, 47; Filing No. 50-1 at 89–90, 135–37, 326; Filing No. 50-7 at 3, 8–9). Jackson-Nibbs never applied for any manager role during her time at United Way (Filing No. 50-1 at 133).

When discussing her concerns about Jones' management style during the April 25, 2018 meeting, Tisdale offered to perform a DiSC assessment of Jones and Jackson-Nibbs to see how they could more effectively work together, and Jackson-Nibbs was receptive to the idea (Filing No. 50-1 at 136–37; Filing No. 50-5 at 24–25). On May 15, 2018, Tisdale met with Jackson-Nibbs and Jones to review their DiSC assessments that identified suggestions on how to effectively work

together. The report showed that Jones and Jackson-Nibbs were extreme opposites in their workstyles. The meeting was helpful for Jackson-Nibbs in that it helped her understand how to communicate better with Jones (Filing No. 50-1 at 138–41, 174, 327; Filing No. 50-7 at 3, 11; Filing No. 50-5 at 26).

When Jackson-Nibbs received her 2017–2018 annual performance review, her summary score had again decreased—down to only 2.8 out of 5—with the same overall score on completion of her individual goals of only 2.7 out of 5.  Ahlrichs reviewed Jackson-Nibbs' performance review and observed a decline in her performance.  Ahlrichs met with Jones about Jackson-Nibbs' performance review, and Jones stated she did not anticipate that Jackson-Nibbs would be able to improve her performance.  Jones noted that Jackson-Nibbs continued to have the same problems: she did not consistently follow through with the quality assurance processes, she did not identify issues and train and retrain staff, and she did not communicate issues as they arose or identify issues. She had a consistent pattern of not following through on directions that were given to complete tasks.   Jones recommended Jackson-Nibbs' employment be terminated. Ahlrichs accepted Jones' recommendation, and Ahlrichs made the decision to terminate Jackson-Nibbs' employment.  On August 15, 2018, Tisdale and Jones met with Jackson-Nibbs and told her that her employment was terminated, explaining that it was ending because of her poor performance (Filing No. 50-1 at 142–44, 395–409; Filing No. 50-4 at 29–30, 49–50; Filing No. 50-3 at 17–19, 28–29; Filing No. 50-5 at 41–42; Filing No. 50-7 at 13–14).

On November 15, 2018, Jackson-Nibbs filed a charge of discrimination against United Way with the United States Equal Employment Opportunity Commission ("EEOC"). In her charge, she alleged race discrimination, retaliation, and a hostile work environment (Filing No. 1-1).  On June 3, 2019, the EEOC issued a dismissal and notice of right to sue letter to Jackson-

Nibbs (Filing No. 1-2). On August 30, 2019, Jackson-Nibbs filed a Complaint against United Way in this Court, asserting claims for race discrimination and retaliation pursuant to Title VII and Section 1981 (Filing No. 1).  Following discovery, United Way filed a Motion for Summary Judgment on Jackson-Nibbs' Title VII and Section 1981 claims (Filing No. 49).

## II.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Jackson-Nibbs as the non-moving party and draws all reasonable inferences in her favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

## III.   <u>DISCUSSION</u>

Jackson-Nibbs asserts four claims in her Complaint, Count One: Race Discrimination in violation of Title VII; Count II: Retaliation in Violation of Title VII; Count III: Intentional Deprivation of Rights Secured to Plaintiff by Section 1981 (failure to promote); Count IV: Retaliation Against Plaintiff in violation of Section 1981. United Way argues that summary judgment is appropriate on the claims of race discrimination and retaliation because the designated evidence shows Jackson-Nibbs was terminated because of her work performance issues, and there is no evidence of discrimination or retaliation. After United Way filed its summary judgment reply brief, Jackson-Nibbs filed her Motion for Leave to File Surreply. The Court will first address the Motion for Leave to File Surreply and then turn to the parties' summary judgment arguments.

A.   **Motion for Leave to File Surreply**

On September 28, 2020, United Way filed its Motion for Summary Judgment.  Two months later, on November 23, 2020, Jackson-Nibbs filed her response to the Motion.  One month later, on December 21, 2020, United Way filed its reply brief.  Jackson-Nibbs then filed her Motion for Leave to File Surreply, arguing that United Way advanced new arguments in its reply brief.  She argues that United Way advanced new arguments concerning (1) disputed facts not being supported by citations in Jackson-Nibbs' response brief, (2) her failure to address arguments about her performance deficiencies, and (3) her failure to address arguments about performance scores.

The "purpose for having a motion, response and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 2010 U.S. Dist. LEXIS 29463, at *4 (S.D. Ind. Mar. 25, 2010).  However, "new arguments and evidence may not be raised for the first time in a reply brief. Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief." *Reis v. Robbins*, 2015 U.S. Dist. LEXIS 23207, at *5 (S.D. Ind. Feb. 26, 2015) (citations omitted). "[T]his serves to prevent the nonmoving party from being sandbagged." *Id.* (citation omitted). Courts allow a surreply only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response.  *See, e.g.*, *id.*; *Miller v. Polaris Labs., LLC*, 2014 U.S. Dist. LEXIS 18161 (S.D. Ind. Feb. 12, 2014).

Upon review of the parties' briefing, the Court determines that United Way's reply brief did not inject new evidence, arguments, or issues into the summary judgment briefing nor did it raise objections to the admissibility of the evidence cited in Jackson-Nibbs' response brief. Instead,

the reply brief provided United Way's rebuttal to the arguments advanced by Jackson-Nibbs in her response brief as well as its assertion that Jackson-Nibbs failed to respond to certain arguments that were in the opening brief. United Way also argued that certain facts alleged by Jackson-Nibbs were not supported by citation to evidence; this is not the same as raising objections to the admissibility of evidence cited in a response brief. The limited circumstances for allowing a surreply—to address new arguments, evidence, or evidentiary objections raised in the reply brief— are not present in this case, and as a result, the Court **denies** Jackson-Nibbs' Motion for Leave to File Surreply.

**B.**     **Motion for Summary Judgment**

United Way argues that Jackson-Nibbs' discrimination and retaliation claims under Title VII and Section 1981[1] fail because there is no evidence to support them. United Way argues that there is no evidence that Jackson-Nibbs was terminated and was not promoted because of her race, and she was not subjected to a hostile work environment. Additionally, she was not retaliated against for any protected activity. The Court will address each claim in turn.

**1.**     **Discrimination Claims**

In her Complaint, Jackson-Nibbs alleges that she experienced racial discrimination when United Way gave her negative performance evaluations, held her to heightened standards, subjected her to a hostile work environment, and eventually terminated her employment (Filing No. 1 at 6). In her summary judgment response, she argues that the evidence would permit a reasonable fact finder to conclude that her termination and failure to receive the title of manager

---

[1] "The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under Section 1981." *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). *See also Alexander v. Wis. Dep't of Heath & Family Servs.*, 263 F.3d 673, 681-82 (7th Cir. 2001) ("we analyze Section 1981 and Title VII discrimination claims in the same manner"). Courts "generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) (citations omitted). Because the parties present their Title VII and Section 1981 arguments together rather than separately, the Court also addresses the claims together.

were based on her race and that she was subjected to a hostile work environment (Filing No. 57 at 17–27).

### a.   **Termination**

The issue in a discrimination case is whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's race, sex, or other protected class caused the termination or other adverse employment action.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The evidence must be considered as a whole instead of asking whether any piece of evidence proves the claim by itself.  *Id.*

A plaintiff supports a discrimination claim by presenting evidence that shows: (1) she belongs to a protected class, (2) she met the employer's legitimate performance expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside her protected class received more favorable treatment. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (citing the *McDonnell Douglas* framework). "Only when the plaintiff has established this prima facie case does the burden shift to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (internal citation and quotation marks omitted).

In this case, there is no dispute that Jackson-Nibbs belonged to a protected class and suffered an adverse employment action. United Way argues that she did not meet its legitimate performance expectations, and there are no similarly situated employees outside her protected class who received more favorable treatment. United Way asserts that Jackson-Nibbs was terminated because of her history of work performance issues, and her initial negative mid-year performance

evaluation was not an adverse employment action because it did not result in the reduction of pay or benefits or termination.

United Way contends that Jackson-Nibbs' performance deficiencies were thoroughly documented in her 2016–2017 and 2017–2018 mid-year and annual performance evaluations.  She was given specific action items to improve her performance, including retraining team members, yet she repeatedly failed to retrain them.  United Way argues that it gave Jackson-Nibbs multiple opportunities to improve her performance over a two-year period, but she failed to do so, so United Way terminated her employment.

As to similarly situated employees outside her protected class who received more favorable treatment, United Way argues that no such comparable employee exists, and in fact, two white employees in the Community Impact Department who received below 3 on their performance evaluations also were terminated for poor performance around the same time as Jackson-Nibbs' termination (Filing No. 50-4 at 28–29). From 2015 to 2018, there were thirteen United Way employees who received a performance score below 3 (Filing No. 50-7 at 2, 6).  Nine employees were terminated for poor performance: six white employees and three African-American employees, including Jackson-Nibbs. All three employees who received scores below 3 for two years in a row were terminated: Jackson-Nibbs, another African-American employee, and a white employee. Two employees were voluntarily separated: one African-American employee and one white employee.  Two employees remain employed with United Way: one African-American employee and one white employee, both of whom improved their performance scores to over 3 the following year.  *Id.*  United Way argues that the evidence shows it consistently treated employees' job performance without regard to race.

Concerning the employees to whom Jackson-Nibbs points as comparators—Lucas Tressler, Brenda West, April Tibbs, Elizabeth Johnson, and Deborah Bullington—United Way argues that none of these individuals qualify as comparators to Jackson-Nibbs. Jackson-Nibbs claims Lucas Tressler ("Tressler") was treated more favorably than her because Jones chose to promote him over the individual Jackson-Nibbs and Prim recommended for a promotion, Natalie Henderson. Jackson-Nibbs also felt Tressler was disrespectful to her, and, as a result, Jones reassigned Tressler to another location (Filing No. 50-1 at 183–84). United Way argues this is not evidence that Tressler was treated more favorably; it was Natalie Henderson who was impacted by his promotion, not Jackson-Nibbs.  And after Tressler allegedly was disrespectful to Jackson-Nibbs, Jones moved him to a different location.  Furthermore, United Way argues, Tressler is not similarly situated to Jackson-Nibbs because, at that time, he was a temporary intake specialist with different job duties and performance standards (Filing No. 50-7 at 3).

As to Brenda West, April Tibbs, Elizabeth Johnson, and Deborah Bullington, United Way asserts that they are not similarly situated to Jackson-Nibbs because they were temporary employees who only worked half the year, had different job descriptions, and had different performance standards.   While Jackson-Nibbs alleges that Jones treated these temporary employees more favorably by giving them second chances when they made multiple errors, by not punishing them for not coming to work on Saturdays or holidays, or by assigning them to the Perry Township location, United Way points out that Jackson-Nibbs also was given numerous chances to improve her performance, and she was not disciplined for failing to work on required Saturdays. These temporary employees were not treated more favorably, as Jackson-Nibbs received the same treatment.  Additionally, United Way asserts, it was Jackson-Nibbs who was supposed to retrain temporary employees on errors they made.

United Way argues that, because Jackson-Nibbs did not meet its legitimate performance expectations and because there are no similarly situated employees outside her protected class who received more favorable treatment, Jackson-Nibbs' race discrimination claim based on her termination cannot survive summary judgment.

Jackson-Nibbs responds that her race discrimination claim is supported by the evidence in that United Way had unrealistic and unachievable performance expectations for her, and similarly situated employees outside her protected class were treated more favorably. She argues that "a legitimate expectation is both (a) objectively reasonable, and (b) adequately communicated to the employee." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 n.7 (7th Cir. 1996). She point out that her early performance evaluations indicated that she was meeting or exceeding expectations.  She notes that the audit error rate established by the granting agency for United Way to avoid a corrective action plan was an error rate below 15%, and during the 2015–2016 performance year, Jackson-Nibbs achieved an audit error rate of 8.15%, but she was only able to achieve this audit error rate by working seven days a week and putting in an extreme number of hours.

When she met with Jones to discuss her goals for the 2016–2017 year, Jones set her audit error rate goal at 7.6%, almost half the rate to avoid a corrective action plan.  Jackson-Nibbs explained that the goal was unrealistic, but Jones left the goal in place. The error rate achieved by Jackson-Nibbs was 13.27%, which was still below the funding agency's required rate of 15%, but Jones rated Jackson-Nibbs low in this category on her performance evaluation. In both the 2016–2017 and 2017–2018 evaluation years, Jones paused the quality assurance process for periods of time and required Jackson-Nibbs to process applications to help with a backlog, which inhibited her ability to achieve her goals.

Jackson-Nibbs points out that United Way changed the entire software system used by EAP for the 2017–2018 year; the new system was difficult to use and did not work well.  The issues with the new system were further exacerbated by EAP receiving it right before the busy winter season.  Jackson-Nibbs argues that the new software system interfered with her ability to reach her goals and increased the time it took to perform her job duties and it was unreasonable for United Way to expect her to meet the already unrealistic audit rate goal in addition to implementing a new and faulty software system. The new system presented so many problems that United Way reverted to the system used in prior years after Jackson-Nibbs' employment was terminated.  Additionally, Jackson-Nibbs argues, she did not have complete control over the audit error rate because EAP applications were processed by the John Boner Center in addition to United Way.  Even though Jackson-Nibbs did not train the John Boner Center staff or audit their files, the audit error rate percentage Jackson-Nibbs was expected to meet included errors from the files processed by the John Boner Center.  Jackson-Nibbs argues that, because United Way's audit error rate goal was unrealistic, unachievable, and illegitimate, she has satisfied the second factor for her race discrimination claim.

Regarding similarly situated employees outside her protected class who were treated more favorably, Jackson-Nibbs points to Tressler, Brenda West, April Tibbs, Elizabeth Johnson, and Deborah Bullington. Tressler was promoted by Jones over other individuals recommended by Jackson-Nibbs, and he was frequently given a lighter workload by Jones than what Jackson-Nibbs would have assigned to him.  Tressler also was reassigned to the Perry Township location where Jones only assigned white employees.  Brenda West, an EAP quality assurance specialist who reported to Jones, did not perform work up to standards and was allowed to continue working at United Way after many errors.  April Tibbs also worked in EAP and reported to Jones, but she was

not required to work Saturdays and was also reassigned to the Perry Township location. Elizabeth Johnson, another EAP employee who reported to Jones, frequently made errors and retrained staff incorrectly, causing hundreds of applications to be processed incorrectly. She suffered no repercussions and was also assigned to work at the Perry Township location. Deborah Bullington, another EAP employee who reported to Jones, also frequently committed errors and was slow to complete her work but was never punished.

Jackson-Nibbs argues that her race discrimination claim based on her termination survives summary judgment because there is no dispute that she is in a protected class and she suffered an adverse employment action when she was terminated, and the evidence shows United Way's performance expectations were unreasonable and illegitimate, and similarly situated employees outside her protected class were treated more favorably.

Upon consideration of the parties' arguments and the designated evidence, the Court concludes that Jackson-Nibbs' race discrimination claim based on her termination must be dismissed at summary judgment. The Seventh Circuit opinion upon which Jackson-Nibbs relies explains, "[t]his court (quite properly) has been reluctant to delineate specifically what constitutes a 'legitimate' expectation on the part of an employer." *Mills*, 83 F.3d at 843 n.7. The Seventh Circuit frequently has stated that the "[c]ourt does not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986); *see also Mintz v. Caterpillar Inc.*, 788 F.3d 673, 680 (7th Cir. 2015) (employee argued that "zero grief" was not a realistic expectation, but whether "zero grief" was a realistic expectation was not for the court to decide, federal courts do not sit as a super-personnel department second-guessing an employer's legitimate concerns about an employee's performance).

22

Jackson-Nibbs focused her argument on whether United Way's audit error rate goal was unreasonable and unrealistic, and therefore, whether she could get around the requirement of showing she was meeting her employer's legitimate work expectations. However, United Way's focus was on Jackson-Nibbs' repeated failure to retrain team members to help lower the audit error rate. United Way recorded on Jackson-Nibbs' performance evaluations and communicated to her the legitimate work expectation that she develop retraining procedures and implement those procedures to retrain team members, yet she failed to do so, and United Way terminated her employment for her failure.

The evidence also indicates that the comparator employees put forward by Jackson-Nibbs are not similarly situated to her because they were temporary employees who had different job descriptions and different performance standards. Furthermore, like the comparator employees, Jackson-Nibbs was not disciplined for not coming to work on a handful of Saturdays, and she was given numerous chances to improve her performance; moreover, Jackson-Nibbs provided no evidence or basis as to why assigning an employee to the Perry Township location would be considered "favorable treatment." The designated evidence considered as a whole shows that Jackson-Nibbs was terminated because of work performance issues, not because of her race, and since she cannot establish a *prima facie* case of race discrimination in her termination, this claim fails at summary judgment.

### b.    Failure to Promote

As to Jackson-Nibbs' claim that United Way racially discriminated against her when it did not promote her to a manager position, United Way argues that she cannot show "she applied for, and was qualified for an open position; she was rejected; and the employer filled the position with a person not in her protected class, or the position remained open." *Howard v. Lear Corp. EEDS*

*and Interiors*, 234 F.3d 1002, 1006 (7th Cir. 2000) (internal numbering omitted). United Way points out that Jackson-Nibbs never applied for a manager position while she worked there. United Way did not have a manager position available in EAP and explained this to Jackson-Nibbs many times. Jones had the managerial responsibilities over EAP as the director, and EAP was funded by a federal grant and was appropriately staffed, and United Way explained that no manager position would be created in EAP. United Way asserts that other individuals who had been promoted applied for positions outside of their division or in non-grant funded areas, and although United Way encouraged Jackson-Nibbs to apply for opportunities outside EAP, she declined to do so. Thus, Jackson-Nibbs' failure to promote claim cannot succeed.

Jackson-Nibbs responds that "the decision not to create a position can be discriminatory, but there must be evidence showing that the decision was racially motivated." *Jones v. City of Springfield, Ill.*, 554 F.3d 669, 673 (7th Cir. 2009). Jackson-Nibbs asserts that United Way failed to give her the EAP manager title and benefits even though she already was doing the work. She did not want United Way to create a new position but simply to recognize the work she already was performing by giving her the job title just as it had previously done by promoting her to EAP associate from her initial job title of EAP coordinator. She argues that an individual who worked at the John Boner Center under the same grant funding held the title of manager, and that individual had similar job responsibilities and worked essentially in the same capacity as Jackson-Nibbs (Filing No. 58-19 at 12).

Jackson-Nibbs further argues that the refusal to give her the manager title came after she made multiple complaints of discrimination based on her race to both Suarez and Ahlrichs. Moreover, United Way frequently promoted white individuals, which she demonstrated to Suarez with the numerous printouts of the announcements of promotions of white employees. Jackson-

24

Nibbs reports that United Way simply responded by telling her to apply for promotions in other areas of United Way.

The Court first notes that the Seventh Circuit opinion upon which Jackson-Nibbs relies states,

> The lack of an opening is always a legitimate reason for refusing to hire or promote. If, for example, no employee is promoted during the relevant time period, a failure-to-promote claim must fail because the claimant cannot argue that he was treated differently than anyone else. In other words, Title VII does not mandate the creation of new positions. In rare cases, the decision not to create a position can be discriminatory, but there must be evidence showing that the decision was racially motivated.

*Jones*, 554 F.3d at 673 (internal citations omitted).

The designated evidence does not support the conclusion that United Way's decision not to create a manager position in EAP was racially motivated to support a discrimination claim. Jackson-Nibbs argues that an individual who worked at the John Boner Center under the same grant funding held the title of manager and essentially performed the same work. However, the job titles and organizational structure of different entities and employers are irrelevant to Jackson-Nibbs' job title at United Way.

Jackson-Nibbs contends that she told United Way that a new position did not need to be created for her to be given the title and benefits of manager; however, the evidence she points to— Filing No. 58-18 at 17 (Dep. 118:4–19)—does not support her contention; that evidence just shows she requested the title of manager. She also argues that giving her the manager job title would be like what United Way had previously done by promoting her to EAP associate from her initial job title of EAP coordinator. However, that initial promotion actually was a promotion, not just a change in title, as her new job was a salaried, exempt position unlike her initial job as a coordinator. Thus, this argument is unavailing.

The evidence shows United Way consistently explained that it did not have a manager position available in EAP because it was appropriately staffed and limited by grant funding constraints. It consistently explained that no manager position would be created in EAP. It also consistently explained that Jones was fulfilling the managerial responsibilities over EAP as the director. United Way invited and encouraged Jackson-Nibbs to apply for other opportunities at United Way outside the EAP program. However, Jackson-Nibbs declined to apply for any manager position while she worked there and did not seek opportunities outside EAP. The evidence does not support Jackson-Nibbs' claim that the failure to promote her to manager or to give her the title of manager was an act of racial discrimination. Therefore, this claim cannot survive summary judgment.

### c.   Hostile Work Environment

"To succeed on a hostile work environment claim, a plaintiff must show: (1) unwelcome harassment; (2) based on a protected characteristic; (3) that was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) a basis for employer liability." *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 977 (7th Cir. 2021). "A hostile work environment is based on the totality of the circumstances. Courts consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal citation and quotation marks omitted).

Jackson-Nibbs argues that she was

…subject to unwelcome harassment and treatment from Ms. Jones. Ms. Jones constantly criticized Ms. Jackson-Nibbs; Ms. Jones unjustifiably blamed Ms. Jackson-Nibbs and found fault with Ms. Jackson-Nibbs' work; Ms. Jones demanded specific projects be done on short notice at specific times; and Ms. Jones constantly interrupted Ms. Jackson-Nibbs during staff meetings in front of other employees. (DOE 201, 234:16-235:5 [Filing No. 58-19 at 5].) Ms. Jones did not treat other

white employees at United Way in a similar way, and in fact treated them more favorably. Ms. Jackson-Nibbs raised the issue of race to Ms. Ahlrichs during their one-on-one meeting in 2017. (DOE 200, 134:15-25 [Filing No. 58-18 at 21]; DOE 203, 114:2-8 [Filing No. 58-21 at 19]).

(Filing No. 57 at 26.)

> Ms. Jackson-Nibbs believed the unfair treatment she was receiving and her strained relationship with Ms. Jones created a hostile work environment. She explained this to Mr. Suarez, Ms. Ahlrichs and Mr. Tisdale. Ms. Jackson-Nibbs testified that she was constantly interrupted by Ms. Jones during staff meetings, was given erratic and short-notice work assignments and was constantly unjustifiably criticized and ridiculed about her work product.

*Id.* (internal citation omitted). Jackson-Nibbs further contends,

> The treatment by Ms. Jones altered the conditions of Ms. Jackson-Nibbs' work environment. Ms. Jackson-Nibbs was so affected by the treatment of Ms. Jones that she did not want to be in the same room as her. Ms. Jackson-Nibbs felt as if she were constantly walking on eggshells and was stressed to be at work. Ms. Jones was a bully and used her authority position in such a way that she targeted Ms. Jackson-Nibbs.

*Id.* at 26–27 (internal citations omitted).

Jackson-Nibbs argues that an employer is vicariously liable for actional discrimination caused by a supervisor, and Jones was Jackson-Nibbs' supervisor and the individual who created the hostile work environment. Jackson-Nibbs complained to Suarez, Ahlrichs, and Tisdale, but rather than conducting an investigation according to United Way's policies, they conducted DiSC profiles to try to help improve communication between Jackson-Nibbs and Jones.

United Way argues that the hostile work environment claim fails because none of the conduct alleged by Jackson-Nibbs is race-based, and it is not sufficiently severe or pervasive to alter conditions of employment, and Title VII is not a "general civility code."  United Way asserts that Jackson-Nibbs essentially alleges that Jones provided due dates for her work, provided feedback on her work, and interrupted her.  When Jackson-Nibbs asked Jones to stop interrupting her, Jones said she would work on it and try to stop.  Because the conduct at issue does not rise to

the level of a hostile or offensive work environment and is not related to race, United Way argues that Jackson-Nibbs' claim fails.

United Way also asserts there is no basis for employer liability because Jackson-Nibbs complained to Suarez that Jones created a hostile work environment based on her management and communication, not based on race.  And United Way addressed the complaint by conducting the DiSC evaluation to help Jones and Jackson-Nibbs with their communication and interactions with each other. United Way argues that Jackson-Nibbs statement that "Ms. Jones did not treat other white employees at United Way in a similar way, and in fact treated them more favorably," is unsupported, in that she provided no citation to evidence to support her conclusory statement. United Way argues that Jackson-Nibbs simply has not shown she was subjected to any specific unwelcome harassment based on her race.

The designated evidence reveals that United Way's position is well-taken. The conduct that Jones undertook and about which Jackson-Nibbs complains in her summary judgment papers consists of Jones being critical of her work, giving her short deadlines, and interrupting her in front of other staff.  Jackson-Nibbs lodged a complaint with Suarez about Jones' temperament creating a hostile, uncomfortable environment because Jones was a "dictator," a "drill sergeant," and "impatient".  Jackson-Nibbs complained to Suarez that Jones did not listen, interrupted, and made others feel stupid.  She did not complain to Suarez that Jones was racially harassing her.

In the March 2017 one-on-one meeting where Jackson-Nibbs discussed the issue of race with Ahlrichs, Jackson-Nibbs explained that she believed white females and males had it better because she saw whites getting promotions, especially in fundraising. She gave this information in response to Ahlrichs' question, "Is [United Way] a great place to work for all diverse employees?" During that same meeting, Jackson-Nibbs reported to Ahlrichs that she was less

happy working at United Way than she was a year earlier because of the number of hours she was working and her department being understaffed.  She did not complain to Ahlrichs that she was being harassed by Jones or by anyone else based on her race.

There is no support in the designated evidence to conclude that Jackson-Nibbs experienced unwelcome harassment based on a protected characteristic—her race. The evidence shows Jackson-Nibbs experienced an uncomfortable environment because of conflicts with the management style and communication of Jones. Based upon the designated evidence, Jackson-Nibbs cannot succeed on her racially hostile work environment claim. Therefore, summary judgment is appropriate on this claim.

### d.  Retaliation Claims

To establish a claim for Title VII retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two. *Burks v. Wis. DOT*, 464 F.3d 744, 758 (7th Cir. 2006). The plaintiff must show that she was retaliated against after engaging in activity protected under Title VII. *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 889 (7th Cir. 2004). Such protected activity consists of opposing or complaining about discrimination or harassment by the employer based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

Jackson-Nibbs argues she suffered retaliation by United Way after she complained about or implied race discrimination.  When requesting the title of EAP Manager and complaining about her treatment to Ahlrichs, Jackson-Nibbs complained of race discrimination; she specifically complained that white employees were being treated more favorably at United Way by receiving promotions. Ahlrichs also understood that when Jackson-Nibbs met with Suarez to discuss the issues she was facing at United Way, Jackson-Nibbs was implying race discrimination.  Jackson-

Nibbs argues that, because Ahlrichs was the head of human resources and she understood that Jackson-Nibbs was complaining about race discrimination, United Way was on notice of Jackson-Nibbs' protected activity.

Jackson-Nibbs met with Ahlrichs prior to her 2016–2017 mid-year review, which is the first review where she received negative performance ratings. She complained to Ahlrichs that white employees in certain departments had it better, and soon thereafter, Jackson-Nibbs received her first negative performance review from Jones. Going forward, Jones gave Jackson-Nibbs negative performance reviews. This occurred after Jackson-Nibbs requested multiple times that she be given a change in title to EAP manager, after she complained of her treatment by and relationship with Jones in her second meeting with Ahlrichs, and after she alleged race discrimination in her meeting with Suarez. Jackson-Nibbs also argues that she was given unrealistic performance goals and her work was unfairly criticized. She asserts that all of these events occurred in a continuous sequence that led up to her eventual termination, so there is a causal connection between her complaints of race discrimination and the adverse employment action she suffered.

United Way argues that Jackson-Nibbs did not lodge any complaints during her employment that constitute statutorily protected activity. It argues that in her March 2017 meeting with Ahlrichs, Jackson-Nibbs stated that she saw white employees in the fundraising department getting promoted, but this comment was made in response to Ahlrichs' standard question, "Is [United Way] a great place to work for all diverse employees," and not as a complaint by Jackson-Nibbs about discriminatory treatment she encountered. In her April 2018 meeting with Suarez, Jackson-Nibbs explained that she felt Jones displayed favoritism and made inappropriate comments about other employees and termination decisions related to temporary staff. However,

she did not attribute Jones' conduct to race; the examples provided by Jackson-Nibbs of alleged favoritism by Jones were employees who Jackson-Nibbs identified as African-American or "mixed" race. And the "inappropriate comments" were comments Jones made about her prior employer. Thus, neither of Jackson-Nibbs' meetings in March 2017 and April 2018 constitute protected activity to support a retaliation claim.

United Way additionally argues that the mid-year evaluation was not an actionable adverse employment action. Anti-retaliation provisions only protect an individual from retaliation that produces a tangible injury or harm, *see Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 677–78 (7th Cir. 2010), and Jackson-Nibbs remained employed following her mid-year evaluations that noted performance deficiencies, and there was no increase or decrease in pay based on mid-year evaluations. Furthermore, United Way asserts, even if Jackson-Nibbs engaged in protected activity, there is no causal connection between that and her termination.  Her termination was based on two years of documented poor performance. Her meeting with Ahlrichs was one and a half years before her termination, and her meeting with Suarez was four months before her termination. United Way argues these meetings are too remote in time to create a causal connection to her termination and therefore, Jackson-Nibbs' retaliation claims must fail.

The Court initially notes that not just any complaint to an employer can give rise to a retaliation claim; the complaint must involve some protected class or activity. "A retaliation claim requires statutorily protected activity, . . . which means that the complaint must involve discrimination that is prohibited by Title VII."  *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019); *see also Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403 (7th Cir. 2007) ("plaintiff may maintain a cause of action under section 1981, where the plaintiff has suffered retaliation for advocating the rights of those protected under section 1981").  Therefore, Jackson-Nibbs' multiple

requests to be made a manager and her complaints about her relationship with Jones are not relevant, as those complaints related to Jones' communication and management style, not race.

When viewing the evidence in the light most favorable to Jackson-Nibbs as the non-moving party, *see Zerante*, 555 F.3d at 584, the Court concludes that Jackson-Nibbs engaged in statutorily protected activity when she responded to Ahlrichs' question on March 10, 2017, that white employees were being treated better and when she implied race discrimination while meeting with Suarez on April 17, 2018.

Jackson-Nibbs received her first negative performance rating on her 2016–2017 mid-year review. United Way asserts the 2016–2017 mid-year review occurred in January or early February 2017 before Jackson-Nibbs met with Ahlrichs on March 10, 2017, while Jackson-Nibbs asserts the 2016–2017 mid-year review occurred in April 2017 shortly after her meeting with Ahlrichs. Again, viewing the evidence in the light most favorable to Jackson-Nibbs as the non-moving party, the Court's analysis considers the claim from the perspective that the 2016–2017 mid-year review occurred in April 2017 shortly after Jackson-Nibbs met with Ahlrichs.

On March 10, 2017, Jackson-Nibbs met with Ahlrichs, and as part of that meeting, Jackson-Nibbs explained that she felt white employees were being treated better at United Way, especially in the fundraising department. The following month, in April 2017, Jackson-Nibbs met with Jones and was given her first negative performance rating on her 2016–2017 mid-year review. Importantly, what is missing in the summary judgment record is any designated evidence that Jones knew about Jackson-Nibbs' race discrimination complaint made to Ahlrichs the month before. There is no evidence that Ahlrichs told Jones about the complaint. There is no evidence that Jackson-Nibbs repeated the complaint to Jones. The case law is clear that "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion," *Dorsey*,

507 F.3d at 627, and "[t]he opposing party cannot meet [her] burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink*, 900 F. Supp. at 1072. There is no evidence to support an inference that Jones knew about Jackson-Nibbs' race discrimination complaint made to Ahlrichs at the time when Jones issued the first negative performance review to Jackson-Nibbs in April 2017. Thus, there can be no causal connection between Jackson-Nibbs' March 2017 complaint to Ahlrichs and Jones' April 2017 negative performance review to support the retaliation claims.

Furthermore, the Court notes that Jones and Jackson-Nibbs set Jackson-Nibbs' 2016–2017 performance goals and action items on August 19, 2016, well before the March 2017 meeting with Ahlrichs. Jackson-Nibbs' goals set on August 19, 2016, included providing high quality EAP services with the action items of retraining intake specialists and updating or creating procedures to minimize errors as well as auditing at least 30% of applications and having an audited error rate below 7.6% (Filing No. 50-1 at 267–68). In her 2016–2017 mid-year performance evaluation, Jackson-Nibbs received a rating of "requires development" for the goal of providing high quality EAP services because she had not created a process to minimize errors and to retrain the intake specialists, and intake specialists were not consistently being retrained in a timely manner to minimize the error rate.  The performance evaluation also noted that Jackson-Nibbs needed to work on timely communicating up-to-date plans and information. These performance goals were set before Jackson-Nibbs met with and complained to Ahlrichs, and Jackson-Nibbs received the negative mid-year performance evaluation because she was not meeting those goals. These same performance deficiencies continued through Jackson-Nibbs' subsequent mid-year and annual performance reviews.

On April 17, 2018, Jackson-Nibbs met with Suarez to discuss numerous concerns.  During their meeting, Jackson-Nibbs implied race discrimination was occurring at United Way. Immediately after Suarez's meeting with Jackson-Nibbs, Suarez met with Ahlrichs to discuss the issues raised by Jackson-Nibbs, including the implied race discrimination. Suarez also shared the concerns with Tisdale. Suarez separately talked with Jones and told her that Jackson-Nibbs met with him about her desire to be a manager, but he did not share any other content of the meeting with Jones.

On April 25, 2018, Jackson-Nibbs met with Tisdale and Ahlrichs to discuss her concerns. During this meeting, Jackson-Nibbs did not raise any issues concerning race. They talked about Jackson-Nibbs' desire to be a manager and her relationship challenges with Jones. Tisdale offered to perform a DiSC assessment of Jones and Jackson-Nibbs to see how they could more effectively work together.  On May 15, 2018, Tisdale met with Jackson-Nibbs and Jones to review their DiSC assessments that identified suggestions on how to effectively work together.

Jackson-Nibbs was later given her 2017–2018 annual performance review, which indicated that she again received a rating of "requires development" for the goal of providing high quality EAP services. This was the second year in a row that Jackson-Nibbs received a performance score below a 3 out of 5.[2]  Jones and Ahlrichs met to discuss Jackson-Nibbs' performance review, and Jones explained that she did not anticipate Jackson-Nibbs would be able to improve her performance.  Jones noted that Jackson-Nibbs continued to have the same problems of failing to communicate and failing to consistently retrain team members.  Jones recommended that Jackson-Nibbs' employment be terminated.  Ahlrichs accepted Jones' recommendation, and Ahlrichs made the decision to terminate Jackson-Nibbs' employment.  On August 15, 2018, four months after

---

[2] The designated evidence indicates that all three employees who received scores below 3 for two years in a row were terminated: Jackson-Nibbs, another African-American employee, and a white employee (Filing No. 50-7 at 2, 6).

Jackson-Nibbs met with Suarez and implied racial discrimination, Tisdale and Jones met with Jackson-Nibbs and told her that her employment was terminated.

There is no evidence in the record to support an inference or to show that Jones knew of Jackson-Nibbs' racial discrimination complaint to Suarez when Jones issued the 2017–2018 annual performance review or when Jones recommended to Ahlrichs that Jackson-Nibbs be terminated. Thus, there can be no causal connection between Jackson-Nibbs' racial discrimination complaint to Suarez and Jones' recommendation that she be terminated.

Ahlrichs made the decision to terminate Jackson-Nibbs' employment. That decision came after Ahlrichs discussed Jackson-Nibbs' performance review with Jones, and Jones had indicated that Jackson-Nibbs was still struggling with the same issues and she did not anticipate improvement in the future. The evidence indicates that this was the second year in a row that Jackson-Nibbs required development and was not meeting expectations overall. The evidence supports the conclusion that Jackson-Nibbs' termination resulted from consistently poor performance, not from her complaint of implied racial discrimination four months earlier. "[A] plaintiff [] must prove the protected activity was the but-for cause of the adverse action—that the adverse action would not have happened without the activity." *Mollet v. City of Greenfield*, 926 F.3d 894, 897 (7th Cir. 2019) (internal citation and quotation marks omitted). Unfortunately for Jackson-Nibbs, the designated evidence shows that she still would have been terminated in August 2018 even if she had not implied racial discrimination when meeting with Suarez in April 2018. Therefore, Jackson-Nibbs' retaliation claims must be dismissed on summary judgment.

### IV.     CONCLUSION

For the reasons discussed above, United Way's Motion for Summary Judgment (Filing No. 49) is **GRANTED**.  Jackson-Nibbs' claims are **DISMISSED**, the trial and final pretrial conference

are hereby **VACATED**, and final judgment will issue under separate order.  Additionally, Jackson-

Nibbs' Motion for Leave to File Surreply (Filing No. 65) is **DENIED**.

      **SO ORDERED.**

Date:  9/20/2021

                          Hon. Tanya Walton Pratt, Chief Judge
                          United States District Court
                          Southern District of Indiana

DISTRIBUTION:

Sandra L. Blevins
BETZ & BLEVINS
sblevins@betzadvocates.com

Chad Harrison Holler
BETZ & BLEVINS
choller@betzadvocates.com

Jennifer Ann Rulon
FROST BROWN TODD LLC
jrulon@fbtlaw.com

Heather L. Wilson
FROST BROWN TODD LLC
hwilson@fbtlaw.com